UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTY LENTZ, | ) | |
| | ) | |
| Petitioner, | ) | 16 C 9516 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| MAGGIE BURKE, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Christy Lentz, an Illinois prisoner convicted of first degree murder and sentenced to 50 years' imprisonment, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Doc. 1. Lentz claims that: (1) the introduction at trial of a videotaped statement she made to the police violated the Fifth and Fourteenth Amendments; and (2) her trial attorney was ineffective in failing to investigate and call certain witnesses. The petition is denied, and the court declines to issue a certificate of appealability.

**Background**

A federal habeas court presumes correct the factual findings made by the last state court to adjudicate the case on the merits, unless those findings are rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012) ("We give great deference to state court factual findings. After AEDPA, we are required to presume a state court's account of the facts correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.") (internal quotation marks omitted). The Appellate Court of Illinois is the last state court to have adjudicated Lentz's criminal case on the merits. *People v. Lentz*, 2015 IL App (2d) 140888-U, 2015 WL 6128590

1

(Ill. App. Oct. 16, 2015); *People v. Lentz*, 2011 IL App (2d) 100448-U, 2011 WL 10452300 (Ill. App. Aug. 30, 2011). Following are the facts as described by that court.

On June 9, 2006, Lentz and her sister informed the Villa Park, Illinois police that their father, Michael Lentz, had been missing since late May. 2015 IL App (2d) 140888-U at ¶ 4. On June 21, the police went to Michael's business, where Lentz also worked. *Ibid.* A handwritten sign said that the business was closed due to a family emergency. *Ibid.* The officers noticed a smell of decomposition and obtained a search warrant. *Ibid.* Inside, they found a wrapped and taped bundle containing Michael's body. *Ibid.* The body was in a plastic bin, and it appeared that someone had unsuccessfully attempted to burn the body in the bin. *Ibid.*

The police went to the house of Chuck Minauskas, Lentz's boyfriend, where they found Lentz, Minauskas, and their seven-year-old daughter, Taylor. *Ibid.* The police brought all three to the station, where they questioned Lentz on videotape for several hours. *Ibid.* Lentz eventually told the police that Michael came at her with a gun and accidentally shot himself after she pushed him away. *Id*. at ¶¶ 4, 6. Lentz was arrested for murder. *Id*. at ¶ 4. She moved to suppress her videotaped statement, but the motion was denied. *Id*. at ¶ 7. The prosecution played the videotaped statement during its case in chief. *Id*. at ¶ 9.

Contrary to what she had told the police at the station, Lentz's defense at trial was to admit that she killed Michael but to argue that the killing was in self-defense. *Id*. at ¶ 33. Four witnesses testified that they had seen Michael act violently in the past; at least two testified that he abused alcohol and "had a reputation for being violent and physically and verbally abusive." *Id*. at ¶¶ 21-24. Lentz testified that she saw Michael assault her mother on multiple occasions during her childhood. *Id*. at ¶ 25. Lentz added that Michael always verbally abused her, and

began physically abusing her between the Summer and Fall of 2005, while she was working at his business.  *Id*. at ¶ 27.

Lentz further testified to the following.  On the day of the killing, May 19, 2006, Michael became angry after reading a letter from the IRS and walked into her office with a gun.  *Id*. at ¶ 28.  Lentz knocked the gun out of Michael's hands and he fell backwards on the desk.  *Ibid*.  When he started to lift himself up, Lentz became terrified that he was going to kill her, so she shot him twice and fled.  *Ibid*.  Lentz returned a few days later, hid Michael's body in a garbage can, and ripped up some bloody carpeting.  *Id*. at ¶ 29.  On June 9, she drove Michael's pickup to Kenosha, Wisconsin and abandoned it.  *Ibid*.  On June 13, Lentz tried to mask the smell of decomposition with air fresheners, and then attempted to burn the garbage can that held the body.  *Ibid*.  When that did not work, she wrapped the garbage can in layers of clothing and tape.  *Ibid*.  Lentz claimed to still be terrified of her father and afraid that he was going "to get up and come back out."  *Ibid*.

Seven prosecution witnesses testified that, as far as they knew, Lentz and Michael had a good relationship.  *Id.* at ¶¶ 14, 15, 18, 19.  In closing arguments, the prosecution maintained that Lentz would not have gone to such great lengths to cover up the killing if she believed it was justified, and observed that, contrary to her testimony as to how the shooting occurred, the ballistics evidence showed that she shot Michael while he was sitting down.  *Id.* at ¶¶ 31-32.  The prosecution further observed that Lentz's trial testimony was inconsistent with her videotaped statement to the police, in which she claimed that Michael accidentally shot himself after she pushed him.  *Id.* at ¶ 32.  The defense responded that Lentz told the police that story "because she was scared and afraid."  *Id*. at ¶ 33.

The jury found Lentz guilty of first degree murder, and the court sentenced her to 50 years' imprisonment. *Id*. at ¶ 35. On direct appeal, Lentz argued that the introduction at trial of her videotaped statement to the police violated her Fifth and Fourteenth Amendment rights. 2011 IL App (2d) 100448-U at ¶ 6. The state appellate court rejected that argument and affirmed, holding that the police did not coerce Lentz's statement and that they did not need to give her *Miranda* warnings because she was not in custody. *Id*. at ¶¶ 29, 37. The Supreme Court of Illinois denied leave to appeal. *People v. Lentz*, 962 N.E.2d 486 (Ill. 2011).

Lentz brought a state postconviction petition for relief, arguing that her trial counsel was ineffective for failing to call three additional witnesses (Taylor, Minauskas, and Minauskas's father Charles) to support her self-defense argument and an expert witness to introduce a battered-woman-syndrome theory. 2015 IL App (2d) 140888-U at ¶ 37. The trial court dismissed the petition on the merits, and the appellate court affirmed. *Id*. at ¶¶ 64-65. The appellate court held that trial counsel's decision not to call Taylor, Minauskas, and Minauskas's father was reasonable because their testimony would have carried little weight, and that counsel reasonably decided not to pursue a battered-woman-syndrome defense because it had little chance of success. *Id*. at ¶¶ 52, 58. The state supreme court again denied leave to appeal. *People v. Lentz*, 48 N.E.3d 1095 (2016).

Having exhausted her state remedies, Lentz timely filed this federal habeas petition.

### Discussion

Federal habeas relief may not be granted for claims subject to 28 U.S.C. § 2254(d) unless the state court's decision "was contrary to" or "involved an unreasonable application of" federal law then clearly established in the holdings of the Supreme Court, § 2254(d)(1), or "was based

4

on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).

## I. Introduction at Trial of Lentz's Videotaped Statement

Lentz contends that the state judiciary unreasonably applied federal law in holding that the introduction at trial of her videotaped statement to the police did not violate the Fifth and Fourteenth Amendments. "For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Ibid*. (internal quotation marks omitted). Put another way, to obtain relief under the "unreasonable application" prong of § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 102. Significant here, "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

"The relevant decision for purposes of [the court's] assessment under [§ 2254(d)] is the decision of the last state court to rule on the merits of the petitioner's claim … ." *Eichwedel v. Chandler*, 696 F.3d 660, 671 (7th Cir. 2012). The last state court decision to rule on the merits of Lentz's claim regarding her videotaped statement was the state appellate court's opinion on direct review. Lentz claims that decision was mistaken in two respects, which are considered in turn.

### A. *Miranda* Custody Issue

First, Lentz argues that the state court unreasonably held that because her interrogation at the police station was not custodial, the police did not violate the Fifth Amendment by failing to give her *Miranda* warnings until well into the interrogation. "[T]he prosecution may not use statements … stemming from custodial interrogation of the defendant unless it demonstrates the use of [*Miranda* warnings] effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). *Miranda* warnings need not be given if the interrogation is not custodial. *See United States v. Patterson*, 826 F.3d 450, 454 (7th Cir. 2016). For *Miranda* purposes, an interrogation is considered custodial if, given the totality of the circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Relevant factors include: "whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed." *United States v. Littledale*, 652 F.3d 698, 701 (7th Cir. 2011).

The state court's discussion of the *Miranda*/custody issue reads as follows:

> [T]he majority of the relevant factors favor a finding that the defendant was not in custody during the pre-*Miranda* portion of the interview. The first factor is the location, time, length, mood, and mode of the questioning. [*People v. Slater*, 886 N.E.2d 986, 994-95 (Ill. 2008).] The questioning took place at a police station, in a conference room in a portion of the building not open to the general public. However, given that the defendant knew that the police wanted to talk to Minauskas at the same time and would want to do so separately, the location of the questioning would not be especially suggestive of custody to a reasonable person. The questioning took place during the late evening and early morning hours. There is no indication, however, that the

6

police chose the time in an attempt to make the defendant more vulnerable; rather, they picked up the defendant for questioning as soon after the discovery of the body as practicable, and commenced the interview within an hour after the defendant arrived at the police station.  As for the mood and mode of the questioning, the trial court placed great weight on these factors, and we agree that both the tone of the questions being asked and the defendant's relaxed demeanor demonstrated a cooperative and voluntary interview rather than a custodial interrogation.

The second factor, the number of police officers present during the interrogation, was neutral in that three officers, a usual number for interviews, were present, and they were in civilian clothes with their weapons secured in their customary holsters.  Two of the officers questioned the defendant while the third officer operated the videotape recorder.  The fourth factor favors a finding that the defendant was not in custody, as none of the indicia of a formal arrest were involved, such as the show of weapons or force, physical restraint, booking or fingerprinting.  The sixth factor, the age, intelligence, and mental makeup of the accused, likewise favors finding of a noncustodial interview, in that the defendant was not a minor and does not appear to have had any difficulty in understanding the nature of the questioning.  The defendant argues on appeal that the defendant was tired, having been awake since 4:45 a.m. the previous morning, and she also told police that she and Minauskas had been in the bar for some hours that afternoon.  Nevertheless, we agree with the trial court's determination that on the videotape the defendant, while occasionally appearing tired, was alert and oriented throughout the questioning and did not show any impairment to her ability to understand the proceedings.

The defendant argues that the manner by which she arrived at the place of questioning would have led a reasonable person to believe that she was in custody.  In addition, Minauskas testified that the police told him that he had to come with them.  This second point, what the police told Minauskas, is irrelevant because there is no evidence that the defendant was aware of it, and thus it could not have affected her perception of whether she was free to decline the request to come to the police station.  *See People v. Alfaro*, 386 Ill. App. 3d 271, 291 (2008) (generally, the personal thoughts of the police officer or others involved are irrelevant unless the officer's belief that the interviewee is a suspect is communicated in some manner to him or her).  However, we agree that the presence of six police officers at Minauskas' home, four of whom accompanied the defendant back to the station, might lead a reasonable person in the defendant's position to conclude that he or she did not have a choice whether to go with the police officers. The State, drawing on police testimony, argues that not all of these officers were assigned to bring the defendant in: some of the officers were originally assigned to pick up Minauskas, and others came to Minauskas' address when they learned that the

defendant was there. Regardless of the reason for the number of officers, however, this factor favors a finding that the defendant was in custody.

Nevertheless, viewing all of the factors together, we conclude that the defendant was not in custody during the pre-*Miranda* portion of the questioning. The defendant emphasizes that she was never told that she was free to leave, and argues that this case is like *People v. Fitzpatrick*, 107 Ill. App. 3d 876 (1982), in which the appellate court reversed the trial court's denial of the motion to suppress the defendant's statement because the police never told the defendant that he was free to leave. In that case, the parties disputed whether the defendant had agreed to come to the police station or whether he had been forced to come. *Id*. at 877-78. In this case, by contrast, the videotape shows the defendant agreeing with [Officer] Kubish that she had voluntarily consented to come to the station and answer questions. This acknowledgment demonstrates that the police did not need to reassure the defendant that she was free to go: the defendant clearly viewed herself as being in control of her own presence at the station. *See People v. Eyler*, 132 Ill. App. 3d 792, 805 (1985) (a voluntary consent to accompany police to the police station for interrogation distinguishes permissible station house interrogation from illegal custodial interrogation). Similarly, as the trial court found, the defendant's comment to the police immediately before the first break that she needed to take her daughter home soon was delivered in a tone indicating that she was telling the police that she could not stay all night and would eventually have to leave-a communication that was consistent with a belief that she remained free to terminate the interview. Indeed, her manner throughout the pre-*Miranda* portion of the question was that of someone voluntarily cooperating with the police in an effort to locate her missing father … .

Finally, we do not view the fact that Kubish and [Officer] Wayda accompanied the defendant outside while she smoked to be suggestive of custody; the police testified that otherwise the defendant could have gotten lost or locked out. The defendant's demeanor remained relaxed and cooperative even after the break, suggesting that she was not intimidated by Kubish's and Wayda's presence outside while she smoked. In sum, we find that taking all of the circumstances into account, a reasonable person in the defendant's position would not have believed that she was not free to terminate the questioning and leave during the pre-*Miranda* portion of the interview. As the defendant was not in custody during this portion, the failure of the police to warn her of her constitutional rights at the outset of the questioning did not violate *Miranda* and her statements were not subject to suppression on that basis.

2011 Ill App (2d) 100448-U at ¶¶ 26-29.

Lentz's habeas challenge to this ruling is without merit. Lentz asserts that the interview was custodial because the police confronted her late in the evening, drove her to the station, separated her from her daughter and boyfriend, and accompanied her outside on a smoke break. Doc. 1 at 29-32. She also emphasizes that six officers came to Minauskas's house to contact her, and three were present for her interview. *Id*. at 31. Yet the appellate court acknowledged those circumstances and reasonably concluded that, in the overall context of the interview, they did not indicate that the interview was custodial. That conclusion is particularly reasonable given Lentz's videotaped admission that the police had asked her if she was willing to come to the station and did not force her to do so. 2011 Ill App (2d) 100448-U at ¶ 14.

Lentz objects that the court improperly relied on certain "subjective" factors, such as the tone of the officers' questions and Lentz's relaxed demeanor. Doc. 1 at 32-33. But the tone of the questions was an objective feature of the interrogation, and the court's reference to Lentz's "relaxed demeanor" simply confirmed what the objective facts suggested—that Lentz knew she was not under arrest and was free to leave at any time. The state court thoroughly applied the general, multifactor *Miranda* custody test to Lentz's case. At the very least, its decision was reasonable. *See Alvarado*, 541 U.S. at 664 (in holding that the state court reasonably ruled that the petitioner was not in custody for *Miranda* purposes, noting that "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

**B.     Voluntariness Issue**

Second, Lentz argues that her videotaped statement, even if not custodial, was inadmissible because the police coerced her into confessing by repeatedly telling her she could not see Taylor, her seven-year-old daughter, until they finished the interview. "The Due Process Clause of the Fourteenth Amendment forbids the admission of an involuntary confession in

9

evidence in a criminal prosecution." *Dassey v.* , 877 F.3d __, 303 (7th Cir. 2017). Lentz does not dispute that the appellate court identified the correct legal standard—that the voluntariness of a confession is determined by analyzing "the totality of all the surrounding circumstances[,] both the characteristics of the accused and the details of the interrogation," *Murdock v. Dorethy*, 846 F.3d 203, 209 (7th Cir. 2017) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973))— but maintains that the court applied that standard unreasonably.

The appellate court's discussion of the voluntariness issue reads as follows:

> During the pre-*Miranda* portion of the questioning, Taylor [Lentz's daughter] was mentioned three times. The first mention occurred shortly after questioning began, when Kubish asked whether the defendant needed food, water, a bathroom break, or anything else. At that point, the defendant told Kubish that Taylor would need to go to bed soon. Her tone of voice on the videotape indicates that she was advising the detectives that she was willing to cooperate and answer questions regarding her missing father but she would eventually need to get Taylor home to bed. The second mention occurred an hour and a half later, after Kubish said that they would need to take a break to change the tape. The defendant asked whether she could take Taylor home "soon" to put her to bed, indicating that she would like to wrap up the questioning at some point in the near future although not necessarily right then. Kubish did not respond directly, stating that they were "just trying to get through all this now." The defendant did not say anything further about Taylor. The police and the defendant then went outside for a half-hour break. Immediately after the break, Kubish made a record of the break, noting that while she was outside the defendant saw her daughter asleep and other family members nearby. The defendant agreed, but voiced a concern that Taylor was being bitten by mosquitos. Wayda reassured her that the other family members would bring Taylor back inside when they were done smoking.
>
> Kubish read the *Miranda* warnings to the defendant less than five minutes after that, and the defendant signed the waiver. A little over a half hour later, at 1:39 a.m., there was a one-minute break. A few minutes after that, the police first told the defendant that they had been inside the business earlier in the day and began confronting her with the fact that the defendant had not told them the truth on various points. There was another one-minute break for the tape to be changed at 1:47 a.m. A few minutes after that, the defendant stated that her father had pulled a gun on her a few weeks ago. A few minutes later (approximately 45 minutes after receiving the *Miranda* warnings), the defendant stated, "You know, I'm probably never going to be able to see my daughter again." Kubish and Wayda both immediately

10

responded, "that's not true." The defendant then stated that her father had come at her with a gun and she had pushed him away and that he had shot himself as he fell.  Between the time that the defendant received the *Miranda* warnings and the time she expressed concern about seeing Taylor as she was preparing to tell the police how her father was shot, the defendant did not indicate that she was concerned about Taylor in any way or wished to see her.

After the defendant first told the officers that her father had accidentally shot himself after she pushed him away, she provided more details about how the incident unfolded, and what she did with her father's body and his truck afterwards.  Kubish and Wayda repeatedly suggested that the defendant, who was small in stature, had help from others, possibly her brother or Minauskas, in handling her father's body and disposing of the truck near Kenosha.  The defendant was adamant that she had done all of it herself and that no one else knew of her father's death.  The officers continued to press the defendant hard on this point, urging her to tell them the full story and be truthful.  It was at this point that the defendant asked Kubish what would happen with her daughter and Kubish responded that they would take care of her daughter and do the right thing, but that he could not tell her what was going to happen with Taylor long-term until she told him what happened with her father.  After that, Kubish and Wayda referred to the defendant's concern for Taylor more often—a total of eight more times—in urging the defendant to give them a full and truthful account.  Although the defendant appeared increasingly tired and stressed during the remaining questioning, at no point did she change her account of any of the significant details of the story that she had told the officers.

This record does not support the defendant's argument that her statement was the product of police coercion relating to whether she could see Taylor or take her home.  The defendant's initial comments about Taylor having to go to bed were not used by the officers to pressure the defendant; rather, the police reassured the defendant that Taylor was being cared for.  When, immediately before she told the police how her father had been shot, the defendant expressed fear that she would never see Taylor again, the officers unanimously told her that was not true.  Thus, there was no coercive use of Taylor's presence or the defendant's concern for her prior to her confession that she was involved in her father's shooting and attempted to cover up his death.  The circumstances here contrast with those used by the police in *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963), in which the police told the defendant that her children would be taken from her if she did not cooperate, and she did not give a statement until after this threat had been made.  Moreover, although we do not condone the officers' later statements that they could not tell the defendant what would happen to Taylor until the defendant had provided a full and truthful statement, the defendant has not identified any manner in which those statements caused her to change her story or provide any substantial new information.  Thus, whatever pressure those statements

> placed on the defendant, they were not the cause of her decision to tell the
> police about how her father had died or what she had done with his body and
> his truck after his death. *See People v. Anderson,* 225 Ill. App. 3d 636, 641
> (1992) (statement was not the product of police coercion where defendant
> decided to confess prior to use of coercive tactics). Accordingly, we find that
> the defendant's statement was voluntarily and freely given, and therefore
> affirm the trial court's denial of the motion to suppress.

2011 Ill App (2d) 100448-U at ¶¶ 32-37.

This ruling was not an unreasonable application of federal law. Lentz protests that the state court did not sufficiently appreciate that the questioning went on for several hours after the officers began casting doubt on her ability to see or retain custody of Taylor, and emphasizes that the prosecution played the full videotape of her interview at trial. But Lentz does not argue that she divulged any information material to her confession due to the officers' threats (implicit or explicit) regarding Taylor. The length of the questioning thus does not undermine the state court's conclusion that Lentz confessed that she killed Michael before the officers made those threats and that she did not "change her story or provide any substantial new information" after the threats commenced.

"Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. 157, 164 (1986); *see also United States v. Sturdivant*, 796 F.3d 690, 695 (7th Cir. 2015). Because Lentz does not argue, let alone show, that the officers' allegedly coercive threats regarding Taylor caused her to confess, this court cannot conclude that the state court unreasonably rejected the voluntariness challenge to her confession. *See United States v. Cabrera*, 2012 WL 2238023, at *9 (S.D. Cal. June 15, 2012) (rejecting a habeas petitioner's claim that certain statements were involuntary where "they were made prior to [the

12

allegedly coercive officer] entering the interrogation room" and thus were "not caused by coercive conduct").

## II. Ineffective Assistance of Counsel

Lentz contends that the state appellate court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in rejecting her ineffective assistance of counsel claim. Under § 2254(d)(1), the "bar for establishing that a state court's application of the *Strickland* standard was 'unreasonable' is a high one." *Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003). "[O]nly a clear error in applying *Strickland* would support a writ of habeas corpus … because *Strickland* calls for inquiry into degrees, thereby adding a layer of respect for a state court's application of the legal standard." *Ibid.* (internal citations, quotation marks, and alterations omitted). Put another way, a federal court must deny habeas relief if the "state court [took] the rule [of *Strickland*] seriously and produce[d] an answer within the range of defensible positions." *Mendiola v. Schomig*, 224 F.3d 589, 591 (7th Cir. 2000). "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal quotation marks omitted).

### A. Failure to Call Taylor, Chuck Minauskas, and Charles Minauskas

Lentz first contends that the appellate court unreasonably applied *Strickland* in rejecting her claim that her trial attorney's failure to call Taylor (her daughter), Chuck Minauskas (her boyfriend), and Charles Minauskas (Chuck's father) to testify about Michael's violent nature constituted ineffective assistance of counsel. For Lentz to have prevailed in state court on this issue, she first had to show that her attorney's failure to call those individuals constituted deficient performance. *See Strickland*, 466 U.S. at 687. In evaluating an attorney's

13

performance, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Second, Lentz had to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Taylor, Chuck, and Charles averred in affidavits that they would have supported Lentz's self-defense theory by corroborating her testimony that Michael had behaved violently towards her in the past. 2015 IL App (2d) 140888-U at ¶ 54. Taylor would have testified that she saw Michael hit Lentz's arm or shoulder, shove her, or pull her ear on five to ten occasions, and that she heard him tell Lentz, "I am going to kill you" and "I swear to God, if you do this again things are going to happen." Doc. 1 at 54-55. Chuck would have testified that Michael abused alcohol daily and regularly abused Lentz verbally. *Id.* at 55. On one occasion, Chuck heard Michael say, "I'll kill her the next time" after yelling at Lentz over the phone. *Ibid.* Charles would have given similar testimony. *Ibid.*

As to the first prong of *Strickland*, the appellate court held that Lentz "failed to overcome the presumption that not introducing their testimony was sound trial strategy since testimony from these witnesses likely would have carried little weight with the jury due to their relationship with the defendant." 2015 IL App (2d) 140888-U at ¶ 56. The court added that Charles's and Chuck's testimony would not have corroborated Lentz's position that her father had become physically abusive in the Summer or Fall of 2005 because they did not "g[i]ve any time frame as to when such [abusive] behavior occurred." *Id.* at ¶ 57. And the court observed that, even if Lentz's attorney had acted unreasonably by failing to call Taylor, Chuck, and Charles, Lentz could not show prejudice under the second prong of *Strickland*: "The evidence in this case was not closely balanced: the defendant's testimony that she shot her father in self-defense was

14

contradicted by her videotaped statement, and the evidence showed that the defendant had taken extraordinary measures to conceal the crime." *Id*. at ¶ 58.

The state court's ruling reasonably applied *Strickland*, for regardless of whether counsel's alleged failure to investigate Taylor's, Chuck's, and Charles's memory of Michael's violent behavior and to call them at trial was within the range of professional competence, the court reasonably concluded that Lentz was not prejudiced because their testimony would have added little to her defense. The jury already heard evidence from several witnesses that Michael was a violent, abusive alcoholic, and trial counsel focused on that testimony in closing argument to support the view that Michael had abused Lentz her whole life. *Id.* at ¶¶ 21-27, 33. Corroborating testimony from Taylor, Charles, and/or Chuck that Michael had been violent towards Lentz in the past could not possibly have made the difference between conviction and acquittal. And even if their testimony would have convinced the jury that Michael regularly assaulted her, the evidence at trial undermined Lentz's submission that he was the initial aggressor on the night in question: the ballistic evidence showed that Lentz shot Michael while he was sitting down; Lentz went to great lengths to conceal the murder, which she would not likely have done if she truly felt the killing was justified; and her account of the killing at trial was inconsistent with her videotaped statement to the police. In the face of that evidence, the state court reasonably concluded that there was no reasonable possibility that the result of Lentz's trial would have been different if Taylor, Charles, and Chuck had testified. *See Mitchell v. Enloe*, 817 F.3d 532, 539-40 (7th Cir. 2016) ("Mitchell … fails to show that he was prejudiced … . To convict for second degree murder under either self-defense or provocation, the jury would have had to believe Mitchell's version of events. But the forensic evidence contradicts Mitchell's story.").

15

**B.     Failure to Call an Expert to Testify Regarding Battered-Woman Syndrome**

Lentz next contends that her trial counsel was ineffective for failing to call a mental health expert to contend that she suffered from battered-woman syndrome. The state appellate court held that counsel acted reasonably because "[t]here is no precedent in [Illinois] for applying battered woman syndrome to a father-daughter relationship" as opposed to an "intimate, marital-like relationship," and counsel cannot be found ineffective for failing to pursue a novel or unrecognized legal theory. 2015 IL App (2d) 140888-U at ¶¶ 51-52 (internal quotation marks omitted). The court added that, because "the defendant's testimony did not demonstrate that she suffered physical abuse over an extended period of time," a battered-woman-syndrome defense would have failed in any event. *Id*. at ¶ 52. The court concluded that "[i]t was sound trial strategy for counsel to rely on the theory of self-defense rather than risk hurting the self-defense theory by stretching it to include" testimony about battered-woman syndrome. *Ibid*. Lentz argues that the state court's decision rests on three unreasonable determinations of fact. *See* 28 U.S.C. § 2254(d)(2).

First, Lentz claims that the state court misinterpreted the expert report from Dr. Ruth Kuncel submitted to support her postconviction petition; in Lentz's view, the state court "wrongly concluded that her opinions were based on a diagnosis of battered-woman syndrome alone," when in fact Dr. Kuncel "opined in her report that [Lentz] exhibited thought and behavior patterns *consistent* with battered woman syndrome *and* post-traumatic stress disorder." Doc. 1 at 50-51. According to Lentz, battered-woman syndrome is merely a "subset of PTSD." Doc. 29 at 9.

Lentz's real quarrel is not with the appellate court's reading of Dr. Kuncel's report, but with its understanding of Illinois law. Lentz does not explain how the label given to her alleged condition affected the state court's conclusion that Illinois has not recognized the defense that

16

Lentz says her trial counsel should have advanced. Regardless of whether an expert would have testified that Lentz was suffering from battered-woman syndrome or PTSD more generally, the form of the defense would have been the same: that a pattern of abuse by Michael (Lentz's father) produced a psychological condition in her that made her believe he was threatening her life. The state court determined that this defense was unavailable under Illinois law in the context of a father-daughter relationship. A federal habeas court cannot call that state law ruling into question. *See Miller v. Zatecky*, 820 F.3d 275, 277 (7th Cir. 2016) (rejecting a habeas petitioner's ineffective assistance claim because state court determined that, "as a matter of *state* law, it would have been futile" for counsel to have made the argument that the petitioner maintained counsel should have made).

Second, Lentz contends that the state court ignored the record when it determined that trial counsel reasonably abandoned the battered-woman-syndrome theory because she suffered only three instances of physical abuse by Michael. Doc. 1 at 53-54. Again, Lentz's real issue is with the state court's reading of state law, not its understanding of the facts. Lentz correctly notes that Dr. Kuncel's report documents verbal and emotional abuse by Michael stretching back to her childhood. But the court was clearly aware of that non-physical abuse, as it noted those findings in its summary of the report. 2015 IL App (2d) 140888-U at ¶ 38. Rather than ignoring the record, the state court was, as Lentz herself puts it, "implicitly h[olding] that the toxic familial environment in which [she] grew up, including the physical and verbal abuse inflicted on other family members," could not support a battered-woman-syndrome defense. Doc. 29 at 11. That is a conclusion about state law, which, as noted, a federal habeas court cannot second-guess. *See Miller*, 820 F.3d at 277.

Third, Lentz argues that the state court improperly assumed that trial counsel made a "strategic decision" not to call a mental health expert, while the record in fact shows that counsel simply failed to investigate the matter. Doc. 1 at 54. But the state court was not finding a fact when it made that remark; rather, it was applying a legal presumption. *Strickland* instructs courts to "presum[e] that, under the circumstances, the challenged action might be considered sound trial strategy." 466 U.S. at 689 (internal quotation marks omitted). The burden is on Lentz to show that her attorney acted outside the range of reasonable professional assistance. She cannot meet that burden because the state court determined that the theory her trial counsel failed to pursue was unavailable under Illinois law. Counsel did not make "the sort of inexplicable omission that renders even an apparently sturdy defense so deficient that the representation as a whole fell below an objective standard of reasonableness." *Bland v. Hardy*, 672 F.3d 445, 451 (7th Cir. 2012) (internal quotation marks omitted). The omission is easily explained: the argument would not have worked.

Finally, the court denies Lentz's request for an evidentiary hearing to investigate trial counsel's reasons for not calling an expert to testify about battered-women syndrome. As a general rule, a federal court cannot supplement the state record when reviewing a habeas petition under § 2254(d). *See Cullen v. Pinholster*, 563 U.S. 170, 185 (2011) ("[W]e … hold that evidence introduced in federal court has no bearing on § 2254(d)(1) review."); 28 U.S.C. § 2254(d)(2) (providing that a habeas petition may be granted if a state court decision "resulted in a decision that was based on an unreasonable determination of the *facts in light of the evidence presented in the State court proceeding*") (emphasis added). As noted, the appellate court's decision on this matter rested on an application of state law. Because Lentz has not shown that the state court's resolution of her ineffective assistance claim was contrary to or unreasonably

18

applied federal law, or that it involved an unreasonable determination of the facts before the state court, an evidentiary hearing is not warranted.

## Conclusion

For the foregoing reasons, Lentz's petition for a writ of habeas corpus is denied. Habeas Rule 11(a) provides that the district court "must issue or deny a certificate of appealability [('COA')] when it enters a final order adverse to the applicant." *See Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011). Regarding Lentz's claims, the applicable standard is:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that … includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.

*Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (internal quotation marks omitted); *see also Lavin*, 641 F.3d at 832.

This court's denial of Lentz's habeas claims relies on settled precedents and principles. The application of those precedents and principles to Lentz's petition does not present difficult or close questions, and so the petition does not meet the standard for granting a certificate of appealability. The court therefore denies a certificate of appealability.

July 18, 2018

_____
United States District Judge